Would the attorneys who intend to do the oral argument step forward and identify yourselves for the record? Good morning, Your Honor. My name is Mike Reagan. I represent the defendant appellants in this case. Good morning, Your Honor. It's Michael Rastak on behalf of the plaintiff's affiliates. I said for the record because neither of you need identify yourselves to us. As soon as you're ready to proceed, you may. May I please report, counsel? You know who I am through our quick introduction here. And together with Linda Kagan, who's seated at the counsel table with me, we represent the defendants. I want to talk about two things this morning, if I could, please. The first is the error in not granting a judgment notwithstanding the verdict. The second is the erroneous non-IPI jury instruction on the standard of care in professional liability cases. The complaint, in any case, governs and frames the issues. Maybe to shorten the time a little bit, why don't you allow us to tell you what I have, and I'm sure my colleagues have on our minds, at the very outset. I would be grateful if you would. The first issue is what in the trial court's record establishes, for consideration by the triers of fact, the applicable regulations that apply in this case. Is it restricted to BOCA, as you would want us to believe, or can it, for purposes of jury consideration, also include ANSI, OSHA, Health and Light, or whatever that is, as well? We believe, as your Honor has pointed out, we... Are you arguing weight here, or are you arguing admissibility? I am arguing admissibility when the entirety of it is considered, first of all. And secondly, there is room under the Pedrick standard for this court to... It's overwhelming one way. Exactly. To direct. And the history... You know, that's also, you know, when Food and the Supreme Court did that for summary judgments as well. Right. Exactly. And the test before the court today is just the same as the test for summary judgment, even though we freely admit that we're dealing with a complete factual trial record here and not the summary judgment record. Let me pose, before you embark, let me pose one other issue, at least in my mind, and this is in terms, again, of what is in the record for the jury to consider and consequently, before us, on a manifest weight of the evidence, a standard of review, what are we to assume that a certificate of substantial completion denotes? Does it denote as simply that the architect certifies payment to be made to the contractors and no other package is attached to it? Or should we assume, as one witness appeared to say, that the certificate of completion signifies a readiness for occupancy and that it therefore would have some bearing on the issuance of a certificate of temporary occupancy, that a certificate of substantial completion certifies that it's ready for occupancy, all that remains is a punctualist, which does not interfere with occupancy, and that consequently it pertains to more than simply this private financial authorization that the architect makes pursuant to his contract with the builder? I don't wish to pander, but I will say that you've articulated that dispute here very well. There is a witness, a plaintiff's expert, who says, well, that means that it's ready to be used, but the weight of the evidence, again, under the Pedrick standard, is that it is only a payment document, that is, that according to the plans, there is sufficient work here to justify payment under those terms. It is also not self-executing. The certificate of substantial completion didn't put anybody in the state jury, it didn't do anything until the school went. Maybe I should append one more trailer here to the certificate of occupancy. Does the certificate of occupancy, as far as your position is concerned, I can see what the answer may be with respect to the appellee's position, but does the certificate of substantial completion certify compliance with code, or can a certificate issue at a point where code has not been complied with and the premises therefore being, at least as far as the code is, the applicable codes are concerned, unsafe? There is nothing in the record which suggests that the certificate of substantial completion certifies compliance with code. There is nothing in the record which says that. At this point, you go in your own direction. I don't mean to channel what you speak to first, but these are the three, let's say, 250-pound gorillas in the room. There's one more, which is proximate cause, and I will get to that in a minute, please. In understanding this case and trying to figure out how come, how could it be that somebody who falls into an orchestra pit is entitled to recover against the architect, you have to start looking at what were the issues that were framed, and the issues are framed by the complaint, and all that survived summary judgment were two allegations, that we failed to design the pit with a permanent or temporary cover, and secondly, that we permitted the school to use the pit, I mean, to use the stage. Now, actually, at this stage, to be correct, there was a design of a pit cover being fabricated under the auspices of the district rather than the contractor. Exactly. There had been two designs. There had been the one that... At the time of the... were executed, although at that time the architect was well aware that SOCA or whatever company was manufacturing it had not yet delivered. Right. And that transaction was the school's responsibility. The school decided for its own purposes, we want to cover it. Except code compliance was VOA's responsibility. There seems to be no dispute as to that. This is probably going back further than this record would indicate, but the trial judge had precluded summary judgment on the first, designed the orchestra pit without a cover. Is that right? Yes. So the trial judge had concluded that there were sufficient factual questions about whether or not the architect had designed this orchestra pit without a cover. Correct. So, I mean, but that went to the jury. That was the ruling of the trial court. Yes. That there were sufficient questions whether the architect had actually designed this without a cover. But there's no dispute in the evidence that although the elevator, elevated pit cover, so to speak, was considered in an earlier design that it was pulled out of there at that time primarily because of a value determination, but later a supplemental design emanated from VOA for a pit cover, although not an elevator pit cover, but a surface cover, was in fact designed and was being fabricated, but clearly not during the period of temporary occupancy, which was obtained by the district, by the institute. So that in a sense then, there was, there would have been a, whether there would have been an architectural malpractice, which is what in fact the trial judge left intact, that issue would be determined by the propriety of issuing a certificate of completion before the cover was actually in place. Is that right? Well, that's not ours. Tell us then what the issue is. The only issue that would be, it has to get to that point because the VOA had proposed a cover, but it had not been purchased. And the question, isn't the question then, to get right to the heart of it, whether turning it over without that cover in place was a negligent act. And was it the proximate cause? And was it the proximate cause? I think that's ultimately, if I were to be. I know you have those issues well spelled out in your complaint, primarily predicated on the fact that the cover would only have been in place on various occasions. It would not have been in place, obviously, if there was an orchestra in that pit. It would not have been in place, perhaps, according to your argument, for many days in between since it required a substantial number of man hours to remove it and put it back in place. And there is also the factor that during construction there are other kinds of protective devices, barricades, which evidently, according to testimony, were in place during construction that were removed during this temporary period of occupancy, although we're a little nebulous on the factual context with regard to that. You might be able to help us by elaborating on that. That's all true. But the heart, one of the hearts of this Court's prior opinion in this case, was that during this period of temporary occupancy, which was occupancy by the school, the school was in complete charge. And there is no- That's not what your opponents say. They say that, if anything, there was some joint responsibility during that period that it wasn't the zero plus where if one is, the other isn't. Hughes, who is the school district's director of facilities, says that the testimony in this case is that it was his understanding that from the moment of the issuance of the Certificate of Temporary Occupancy that the school had complete control and that the school kept it locked. And as this Court talked about in its prior opinion, there is none of the defendants and not VOA had any control over who was going to be on the stage, what they were going to use it for, how they were going to act, or anything else once that was issued. Now, if the cover had been there, if the cover had been there, it would be entirely within the school's decision as to whether the cover was going to be installed at all. I mean, it could have arrived and it would just be sitting in a box. That was the school's decision to do. Or if it had been in place, it could have been taken off. And what this illustrates is that at all times the proximate causal connection between anything they want to say about what VOA did and how the stage was being used and whether it was covered or not was entirely a school decision. Why would that not have been a foreseeability issue in terms of the jury making a determination? I don't think they have to make a categorical determination, but they have to determine probability-wise whether it would have been in place had it been available. Because the school has authority and we do not have authority. It would be an impermissible conclusion by the jury because we didn't have the authority. Now, if this court were to affirm this verdict, then we have to think about what the consequences are. Should we be held liable here because the school made the decision to use the stage without a pit cover in place? And if we're liable here, are we then liable for the next injury which happens? Let's bring it a little closer to the earthly plane here. What if you, according to your position, you don't dispute that the applicability of VOCA. You claim that VOCA is generic in requiring safety and specific in excluding stages for performance theaters from meeting the requirements of having fall prevention barriers. Okay. Supposing that were not the case. Supposing VOCA would say what ANSI says, that you need fall protection and guardrails. Okay? At that point, would you still have a proximate cause argument and how would you make it? The, yes, we, well, first of all, attacking the premise for just a minute. I mean, this court, if you're going to decide the case in the plaintiff's favor and say this code testimony is applicable in persuasion, you would have to get over the dispute in the record as to whether ANSI and everything else is confined. I understand. Mr. Reagan, I'm obviously not slipping from what I started out with as the grasp, my grasp on the facts. And I'm asking a hypothetical just to test your proximate cause argument. The, well, I mean, the hypothetical in a sense. Supposing the regulation mandated a cover, would you still say that that mandate is a spiral staircase leading nowhere because you could never challenge or seek damages for its violation since it depends on the intervening acts of other parties, other forces, other events. It does. So it would never be subject, in effect, to any kind of private enforcement. Well, exactly. Because their code testimony. That's your position. Yes, that is our position. And their code testimony is this. Both Petrowski and Wisniewski say this. That either the cover has to be in place or, under their view, there have to be guardrails or a person guarding it at all times. And for this court to affirm the verdict, then you have to buy into that proposition that that's what every orchestra pit in America has to look like. That when the cover is not there, guardrails or a cast member perhaps. Now, if you also added the fact that it would be in the regulation or at least well established in the common law or in the custom and usages of the construction industry that you don't issue a certificate of substantial completion if code regulations are not fully implemented. And at that point, would you still have a proximate cause argument? We would. Because it is always cause and fact. Cause and fact, but for causation. Can it be said that this injury would have occurred, but would not have occurred, but for the negligence? And it can't be said because of what this court talked about, which is the control of the area. So VOA, even if the cover had been there, could never have assured that this permanent cover is in place. If it has to be in place, then why do you have an orchestra pit? And so in this court's opinion, you cited the Johnson case in section 385, which I'm sure the court has full memory of, which says. Well, I don't need full memory since I brought it with me. As did I. And I brought the real thing, not the Westlaw pale imitation. But in any event, Johnson, in the last sentence of the part that the court quotes, says that these matters with respect to design professionals should be decided by proximate cause, and that's this case. That's under 385. That's under 385. But still, the lesson about proximate cause is there. And the but-for test of legal causation cannot be met here. I realize I'm running out of time. So two things, please. The other branch of proximate cause, which is legal cause, the defendant's brief, page 29, says that the legal cause exists because the purpose of the cover was to prevent this type of accident. But the school said that the pit cover was not a safety issue, in its opinion, but was rather to bring But there you're getting us into a manifest way to the evidence issue because there is conflicting testimony. Yeah. There is. But this Court still has, may I say with respect, the pedigreed responsibility of engaging in that limited assessment of the evidence. Without becoming jurors. Without becoming jurors. But there is room for that here. And when you look at the reality of this testimony, none of their experts had ever designed a theater. They didn't regard themselves to be experts in the theater design. And when you take their expert evidence. But Lewizinski, the architect who testified, was a former OSHA inspector, was he not? He was that. He was many things. So he knew about codes. He knew about codes as they applied. He may not have passed muster as an architect of school construction, but he was an architect who was alerted to the applicability of codes. So I don't think, at least your opponents, don't think you're serious in arguing his qualifications to testify, but that you're only arguing weight. That's what they say. Are they wrong? Well, Pedrick is the link between us. And I'm not sure whether, and Pucholsky. Pucholsky likewise. In time, because I really think this is an extremely important issue. If I could, please, we hope you're going to give us the JNOV. But if you don't, we're entitled to a new trial. And the reason is the standard of care instruction. But you didn't supply a, at the time, for giving the instruction in the form you wanted. You did not do that. We absolutely did not, Justice Breyer. That's true. So technically we can forfeit, but you're asking us to follow the example of the Supreme Court in saying this issue is too important to that forfeiture that is not binding upon us and it's too important to abandon. Exactly. And I don't have to spend the time developing that. In Dillon v. Semerson Hospital, they did that precisely. And it is important here. But this case has the additional wrinkle. And I've traced in my own mind and a bit in the brief the reason for the rule which says that the proponent of the instruction, the appellant has to come in with a copy of the instruction. And the reason is said to be administrative convenience for two reasons. One, so if the trial court's not left to guess as to what the instruction might look like. Yeah, obviously your contention was give the instruction as written. Every court has the 105.1 on its shelf or before it, although it does not have the amenurences that you could supply by actually distributing copies. But it's not in the dark, granted. The court is not in the dark. And the second part of the rule is the court shouldn't have to have turned to its clerk and have it type the instruction. What makes this case unique is that the correct instruction, IPI 105.01, was in the trial judge's hands. The plaintiff brought it to court and said, here's our 105.01. And then the court, then the plaintiff said, oh, wait a minute, that's a mistake. I didn't mean to tender that instruction. How serious is that prejudice? Or let's put it the way Justice Forsard put it in Matt's release. How serious is the correction since it leaves the initial confusion of 105.1 intact, which is first it says, listen to the experts. You must listen and follow the opinions of the experts. Then it winds up even with the interpolation of the omitted sentence saying what constitutes reasonable care is not defined in the law. It's for you to determine. And that would remain whether the omitted sentence, you are asked not to follow, you know, not to make the decision from your own experience, but on the basis of experts, it would still be confused by the last sentence. So in that sense, where is the prejudice since the prejudice is built in to 105.1? I don't wish to step into the dispute between the first district and the second district about this. And the Supreme Court is going to decide this because it has granted the PLA in stooped. But in stooped, the court took up the question that you've brought up. And it's said that that language, the only language they can point out to save themselves here is in the next paragraph, which says, I take that back. I'm not sure it's the next paragraph. But basically it says that, you know, you're to determine whether these things have been violated. But the standard of care is the heart, is the absolute, pivotal heart, and the jury is not permitted to use its own consequences. But that first sentence in 105.1 already makes that statement. Well, it's the problem comes from the last sentence, not from the middle sentence, which was omitted. Well, but it's key. And as Justice Gordon wrote in the LaSalle Bank case, it's not for the courts to write instructions if there is an applicable IP. But unfortunately, Mr. Reagan, I don't think that we need become oblivious to that in terms of resolving the forfeiture problem. In other words, if we are, so to speak, averting a gross injustice based on your ministerial momentary distraction and avoidance of submitting the, that's not how your opponents incidentally characterize it. I understand. At any rate, where is the gross injustice if we should reverse a case because of an omitted sentence that doesn't cure the confusion that you're claiming that omitted sentence would have clarified? But it does. The sentence that Matt Arese got focused on talks about the jury's responsibility with respect to determining other aspects of the case and not determining what this paragraph is to be about, which is what is the standard of care. There are different sentences. Now, the tiebreaker here, if you will, is that in the cautionary instruction, which we have in the reply brief, we have the language of it in the reply brief, the jury is told by the judge, every word from the judge's mouth matters. If it doesn't, we might as well all go home. And they're told, you may use your own experience in determining the issues in this case. So the purpose of the omitted instruction was to countermand what the judge had already told them, which is you can use your own experience, et cetera. But it only lends partial light. It only pulls the curtain a smidgen, if that. I think it's a powerful sentence. And the heart of this instruction is so different than just about anything else the jury is told. In just about any other area, the jury says, this is for you folks to decide. In this area, they're not. And the fact that this instruction is the cause of the foment of such litigation, such appellate turmoil at this point, demonstrates its importance. And the plaintiffs have been, and I'll finish with this, the plaintiffs have been highly inconsistent in why they think that was supportable. Because, you know, at trial they said one thing. At trial they said, well, you know, we have to take that out because codes and standards are here. And therefore, you know, they don't, they can apply their own experience to interpreting codes and standards. But when you read that paragraph as a whole, that's not true. And here their justification sort of gets to what you've posed, Justice Gordon, which is that, well, it's up to the jury to determine whether these were reasonably safe premises. No, I refrain from saying that. And I'm not sure that your opponents say that with their full composure, so to speak. It may be between the lines, but they don't say that this should be decided as a matter of common knowledge and experience. They don't bring Bryant into it. But they do say that it is okay to omit that sentence because the jury's ultimate responsibility is to determine whether something is reasonably safe, and therefore it's okay to take it out. So my time's up. If there are any other questions, I will. You'll have time for rebuttal. Thank you, Your Honors. Good morning, Your Honors. Michael Rassack on behalf of the plaintiff's affilies. I was poised to answer the question, Your Honor. I can see it coming. With respect to the codes, our architect, I'm sorry, our engineer, Dennis Pachowski, identified all the codes. He said all the codes apply to this construction. Then Mr. Wisniewski, our architect, also identified the codes, all of the codes, not just BOCA, and said they all apply. I think it said 522. Let me ask you, since these codes exist in some corporeal form and take the form of some regulation, are we to treat them simply as a question of fact, or can we look at the codes and make a de novo determination whether they're intended to apply to this particular context in construction? So that if ANSI says this is only applicable with regard to handicapping handicapped safety, and not to any other kind, the fact that a dozen of your witnesses may say it's applicable here, should it bind us? I think the answer to that question, Your Honor, is if there's something in the regulation or the code that clearly takes it away from the situation before the court, then an expert witness can't put that back in. And if BOCA doesn't apply to new construction on its face, should we necessarily defer to Puchelski or to Lesinewski, if I'm pronouncing his name correctly, in saying that it does? Although there's curious articulation by one of the witnesses by saying that BOCA makes the reference to OSHA. But we can determine that for ourselves also. Exactly. That BOCA makes the reference to OSHA was provided by one of the witnesses. Nobody objected. And so that's what the jury based its decision upon. For this court to go behind that would be taking away something that went to the jury without a problem. But the experts also testified, and I think this is probably across the board in many cases, that OSHA has become a standard. The only person I think that you can find under OSHA is the employer. But OSHA has, in fact, become a standard for construction activity. And almost all the experts in all the cases say that, and that's what Mr. Wisniewski said here. So it's there whether you want it to be there or not. Does the code violation determine that a prima facie case is made without regard to our own analysis of proximate cause? No. And I agree. We still have an evaluation to make. All it does is prima facie a violation. Exactly. And even then, it would depend on how the code is worded. If the speed limit is 75, we don't have to bring somebody in to testify that that's what it says. The difference is when you get the construction codes, they've obviously been used in different contexts. They have contracts that take people in and out of codes, and you end up getting expert testimony for no other reason than to describe how a construction site works. Isn't that OSHA a standard for safety? It is, and it's become a standard for safety throughout the country. And in the plaintiff's complaint here, was there any allegations of a duty to warn? To be honest, Your Honor, I don't recall. I don't believe so. It did not go to the jury on a duty to warn issue. It went to the jury. There's no expert testimony of a duty to warn? There's nothing in the trial about it. I know that. So one of the two issues that went to the jury is basically whether or not should VOA have allowed this design to exist. Can OSHA inspectors give citations for a violation to new construction projects? Can they cite violations in new construction projects? Yes, as far as I know, Your Honor. Because your opponents say it only and does not apply to new construction. No, I did not even understand that to be their argument. I mean, OSHA is there on job sites. I don't know if this case was investigated by OSHA, but this would be a classic OSHA. I'm sorry, Justice Ginsburg. I was going to ask, the second issue that went to the jury was what again? The second issue is whether or not the VOA erred when it issued the certificate of substantial completion, something that Justice Gordon had explored earlier. And the testimony by Mr. Wisniewski was that it was wrong to issue the certificate of substantial completion because you should not issue it until the job is complete. This job wasn't complete. And Wisniewski also said this includes safety issues. And Mr. Migon, if I'm pronouncing his name right, from VOA, basically said the same thing. I mean, he said that when we issue the certificate, that means it's okay to use it. And the testimony was it's not okay to use it without a pit cover. And it's not okay to use it without a pit cover because the court knows it's black, you can't see it, and because it's nine feet deep. We don't have to close down every orchestra pit in the country. We just have to provide fall protection if they're more than six feet deep. That's what everybody, I think, agreed to in the court. That's why OSHA applied because the fall was more than six feet. It wasn't an egress under the Boca exception because it was more than four feet deep and it had to have fall protection. But, again, the argument is that ingress and egress is almost an incidental description of its applicable context because it says corridors, intervening rooms, and lobbies are considered means of egress or ingress. So the auditorium itself is, according to that definition, capable of being characterized as a means of ingress and egress. The auditorium may be a means of ingress and egress but not the pit. I think even Mr. Hanson from BOA said, no, if it's more than nine feet deep. If my lawyers, when asking me about that, were referring to that code, if it's more than six feet, if it's nine feet deep, it doesn't make sense. Are you fair in using the pit? Isn't that begging the question? Because that regulation would say you don't have to provide, if we read it as your opponents read it, that you don't have to apply guardrails around performance stages. When it's in ingress and egress, it means that you can have a ten-foot or a hundred-foot pit as long as it involves putting a guardrail around the stage or putting up a barrier around the stage, that you don't need that protection in matters of ingress and egress. The rationale being with stages is that every stage is elevated. It can't be overly encumbered as a stage because it will interfere with the performance function, particularly, I imagine, if you had tap dancers or whatever, where you would want to see what their feet were doing. Now, in that sense, isn't the area of the orchestra pit at the very perimeter of the stage and would be subject to that exclusion? It would not, again, because it's more than nine feet deep, and even if a hallway is in egress, if there's a nine-foot gap in the hallway, I don't think any expert, anybody looking at it would say it's not a matter of egress. It's got a pit and you have to cover it. And the stage obviously wasn't being used for performance at the time. Performance, for one thing, there would have been people in there. But then the argument is even if it's not used for performance, it's not going to be the occupant is not going to have that pit in place at every moment other than the moments or the specific times of performance. That's not the practice with a pit covers, and no one is seen to dispute that. If there's a stage play going on and it's going to run for two weeks, I assume they don't block it. They're not going to replace it every night. But on the other hand, at that point, the theater is going to be lit, there's going to be something in the pit that you will see, and that's not the circumstances we have here. And even Passion, if your Honor recalls, Passion especially, they're not even a party to the case anymore. Well, they were dropped. On the last appeal they were dropped. Exactly. To make this simple, what is an architect's duty to Mr. Madden? The architect's duty to Mr. Madden is to comply with that architect's job on the site. In other words, the school district hired the architect and said they hired him and we rely on him for safety codes. The architect now takes over the owner's duties to comply with safety codes. And I don't think there's even any dispute about that. Everybody agreed that the architect had to enforce the safety codes. And they did not here because even their own people admitted that. Where does he have to enforce it? In his plans or in his actual implementation? On the site. And it goes one step beyond that. Does he have to make a safety inspection of the premises to make sure that his design for safety is met? Does he have an independent duty to protect the safety implementations of his design other than his general duty to make sure that an architect does the job he's supposed to do, that he follows plans for purposes of being entitled to payment? I don't recall that they got into whether or not he has to enforce that. Because otherwise we're getting into a control issue. That's right. Which is not alive, I think, here after my first opinion. What we have here in this situation, though, to go one step back from Justice Gordon's question, is one more step. It wasn't simply a matter of the architect being required to enforce safety. I don't know about inspecting, but they knew that the pit cover wasn't there. Everybody knows it wasn't there. But what happened and what the key is here and to the second issue that went to the jury is that if the court recalls, the people building this said to VOA, do we need a pit cover? Is this a safety issue? And VOA came back and said, told the district it's not. And that's the motive. Mr. Ratzek, as I read that question, in my mind it's basically only a lie insofar as it's reflected in the issuance of the Certificate of Completion. If the Certificate of Completion certifies that it is being turned over in full code compliance, then obviously the liability against the architect has basis. On the other hand, if that certificate does not make that promise, then I'm searching for the basis of the architect's liability here. Where is he liable? At what point and how? Through what action does he become liable? Mr. Wisniewski, I believe, and I think it's at 529, said that the certificate essentially means that it has to be safe for occupancy. Is it like Nelson versus Weyer? Is it a certification to the world or is it only a certification if he's correct that it does that, only as far as the owner is concerned? To say, pay up. It's now ready for occupancy. But is that a warranty to the world? I suppose you can argue, you know, Nelson versus Weyer Oak and make it so. But that's what it means. Everybody, I think everybody agrees, everybody did agree that the owner, that the district did, could, in fact, did rely upon VOA. So once they rely upon VOA, when VOA says to do it, it not only affects the issue of not issuing the certificate of completion, it also proves my point, which was that VOA was the one responsible for the design of the cover because they're the one that said you don't need a cover. That's the design of the cover. It's the same as not doing it. It's the same as doing it. We're in the area of proximate cause here, I think. And we have to be, I'm curious. Even if the certificate of completion would make that warranty, what is the connection between the certificate of completion and the issuance by the municipality of a certificate of temporary occupancy? And would that have been available in any instance? And if so, where's the proximate cause? The certificate of temporary occupancy was based upon a plan, the original plans, I believe, which showed that there was a picture. The architect basically, apparently, has no involvement in that, at least that has been pointed out to be of record. That's strictly issued through, I suppose, an inspection by the municipality and their determination that you could have temporary occupancy. And if that's the case, where is the fault of the architect as a causative factor of the injury? Because the certificate of substantial completion, which is what the jury heard emphasized, meant to the district it's okay to have this proof. So you're saying that the district relies on that certificate to determine that it doesn't need a pit cover. Obviously, however, in this case, they determined that they do need a pit cover because one was ordered, $94,000. They did, but the $94,000 out of a $150 million project, they didn't put it in. And the reason that they didn't put it in, even though they had one, was presumably, and I think the jury is allowed to draw this conclusion, was because VOA said it's not a safety concern. So there's no rush about it. I don't know if I have to read between the lines, but it seems pretty clear that Mr. Hughes, if he had been told, if when Paschen asked VOA, do we need a cover, is that a safety concern, and VOA said it is, you do, they would have put one in, he would have fallen off the stage. That's the proximate cause analogy. So it really then all hangs on the message encoded in the certificate of completion. And going back to the design issue, I'm sorry, there's two issues. The design issue is not having a cover and telling the owner it's okay. But that's a moot issue because at the time the certificate was issued, there already was a supplemental design for the cover. So the fact that the original one was deleted is moot. How does that impact on legal cause, or as a matter of fact, cause in fact? Because when the design includes the cover, with that, and I think I understand where your Honor said it, with that comes the belief, with that comes the understanding that the cover will be there when the stage is used. It doesn't do any good to put a fire extinguisher in a year from now. If you're in the building, you need the fire extinguisher there now, and that's a design issue. I suppose the conclusion to that is they should have said you need a cover and you need it now. I think the need it now comes from the fact that if you don't. But they don't need it during construction because they can have other protective devices. They could, but they do need it during construction if you're going to use the stage for anything else, and everybody knows that. I'm not sure, Mr. Rasack, and I don't mean to press you to the wall, but you're pressing us for a decision here. I agree. So we have to press back. And the question is, without that certificate of completion, where are you? With my first issue, with the design issue. I have to go back to that. I think the case probably came down, and I always regret saying things when I haven't thought them out before this particular court. It really came down to they shouldn't have issued the certificate of completion. That became the point, I think, that was argued to the jury. You shouldn't have been there. Nobody should have been there. It was wrong. You couldn't even use the stage for full production. You had a limited use. Everybody knew you needed a cover or a guardrail. They don't need a cover if they put a guardrail. Not having the pit cover is okay if the architect who's supposed to be in charge and who has this design issue should have something else there. Paschen thought their guardrails were going to stay there. So I don't think we're not out of the left field by suggesting this needed a guard area. I understand my opponents say it doesn't, that it will destroy the theater industry. Does the record reflect the gap period of when those guardrails that evidently were utilized during construction were removed? Was it removed after the certificate of temporary occupancy? Was it issued after premises were turned over? I don't believe that there's testimony exactly when they were removed. They were removed at some point. They should have been removed after the certificate was issued, because until the certificate of substantial completion is issued, Paschen is right there. It's only after the certificate is issued that Mr. Schneider, the defense expert, said they're now in joint possession of the stage, something I wanted to mention, as opposed to 100 percent control. That came from Mr. Schneider himself. How can you justify the slightly, what do you call it, the slightly modified version of the IPI? A bono 501? In retrospect, I wish we hadn't, obviously, and I don't mean to be seditious, I wish we had left the sentence in, and I say that because it doesn't matter either way. Was it really for the jury to determine using their own common sense what a code ever means? And the problem that the trial judge saw is that intertwined with the standard of care is this question of whether it's substantially complete. Whether it's substantially complete, that doesn't require expert testimony. And the trial court judge looked at it and accepted there might be a problem with it. Do you really believe that whether it was substantially complete is strictly commonsensical when you have all these experts telling them about the codes? And, you know, I mean, there's nothing commonsensical about an architect's plans. I mean, I think it's all expert. So I don't know how you can say that. You say it's all due care rather than professional care. Is that right? At some point, this is the question. The two layers have got to be there. The ordinary or due care and the professional care. You say this is strictly a matter of ordinary care. It's a race ipsa. It's not race ipsa, but I actually believe it could go to the jury on the question of whether or not it was. The simple question of substantial completion should be able to go to the jury without an expert witness because it's a question of people describing their work. This is what we did. This is what our contracts told us to do. And from that, you draw the conclusion whether it's substantially complete or not. Now, obviously, we did offer expert testimony. Well, I should tell you that I recall, and I don't have it with me, somewhere in the early 90s, I decided a case involving the duty of a doctor to how many phone calls he has to make to a patient when she has an ectopic pregnancy. I think the defendant's name was He Su, or it was a doctor from a Chinese descent in a neighborhood of Chinese immigrants, I recall. That was an issue in the case. And it's a question of when he could stop trying to call if he can't locate the woman whom he examined for whom he discovered an ectopic pregnancy, which is lethal, fatal. And there was no expert testimony. And I at that point held that it was a matter of professional negligence rather than ordinary negligence. And the failure to have an expert testimony prevented a verdict. And I have no quarrel with either the opinion or its reasoning. Even though it had a lot of commonsensical, visceral, intuitive kinds of determinants. But underlying it, nevertheless, was the question of how long and how persistent must a doctor be once he tries to contact if he fails. In this situation, and I was just going to conclude with that point, the judge agreed we had a problem here and said we'll finish up this process when we get to you. I've never seen such an open invitation from the trial court to say, well, I disagree with you, counsel, right now, but we are going to get back to this. And when counsel doesn't come back when he's specifically been told to do it, it's more than a forfeiture. It's a waiver. And I believe a waiver is binding on the courts. A forfeiture may not be, but a waiver, I think, should be. Because you think it was intentional. Exactly. Because the trial court judge sitting there could well say, you know, Rasek was really worked up about this, but now we've gotten to him, he seems to have changed his mind. It would surely not be the first time in the history of a trial that somebody bit his tongue and said, you know, I'm winning. I'm going to leave this alone. I don't want an issue on appeal. Certainly anybody that does what Mr. Raken and I do as counsel lawyers, just leave it to go. You're winning the case. So we don't know that, and we don't know much about it because the post-trial motion, if this was such a significant issue, there would have been more than two scant paragraphs at page 22 of a post-trial motion, and the trial defense lawyer would have said something about this in his closing argument. 10501 was not made an issue by them. So I suspect that the trial attorney's decision was one of choice, not one of neglect. Let me ask you one other question on an issue that wasn't brought out by the appellant on oral argument, but is in his brief. How do you have non-architectural experts testify as to a standard of care for an architect? And my short answer is we did not. All that Mr. Roach from Passion and Mr. Paschalski, as the plaintiff's expert said, these are the building codes, these apply to this project. They specifically did not say that an architect breached the standard of care. As a matter of fact, one of the arguments in the defendant's brief is that Mr. Roach never connected up the code violations with what an architect should do, thus essentially becoming an admission that the engineers did not establish standard of care. That came solely from Mr. Wisniewski. And Mr. Wisniewski, I think, nailed that one. I don't think anybody's quarreled with the fact that he testified standard of care. So it's your argument no improper inferences came from that test? Exactly. Anything else? No. Thank you very much. I've been sitting there the entire time looking for the opportunity. Will three or four minutes be enough for you? Pardon me? Will three or four minutes be enough? Yes, absolutely. But I was looking for an opportunity to accuse him of tap dancing to pick up on your comment earlier, and he gave it to me at the end in response to Justice McBride's question about 105.01. And he would counter since he doesn't have the last word that you're dramatizing. Considering it's a staged case, we all are for sure. And if this verdict is affirmed, there will be a great deal of drama around the country about it. Substantial completion. That's rather dramatic. Substantial completion is not intertwined with the standard of care. And that's what they were saying in response to you. Look, we're entitled to take out this sentence from IPI on our own because the substantial completion and reasonably safe questions for the jury and it's wrapped up in the standard of care, it's not. The freestanding pivot on which all these cases turn is how do you determine the standard of care? In response to the question of, or the comments rather, about is this a matter of common knowledge, it's not. What they say is common knowledge is that any layman, any juror, should be entitled to issue a certificate of substantial completion. That's not the case. Justice Gordon, you asked the question about whether there was any allegation of a duty to warn in this case. There wasn't. It's not in the complaint. It's not in the issue's instructions. The business of the ingress and the egress and the fact that they talk about, clearly say that you don't need fall protection for this type of situation. And when it's under a section talking about ingress and egress, it puts me in mind of the title of statutes being held to be not part of the statute. You look at the wording of the statute and not the title, except in very rare circumstances. I know you can find some. And likewise, here you look at the code. Regardless of whether it is within a section dealing with ingress and egress, the code plainly says, the most specific code, and the court does have the right to look at it like a statute to determine applicability, and it says that you don't need a pit for that or you don't need a guard. There's very little question here that if there was no workman's comp defense here, that the district itself could be found liable by a jury for not providing Mr. Madden with a safe place to work. Because there was the pit, it was painted black, as was the stage, it wasn't open and obvious necessarily, at least there would be a question of that, so that we can't simply assume that the regulations would avoid it, nor is it all that clear that due care, which is ordinary care, can't be applied to it. They may not find necessarily a deviation of the professional standard, but they could find, deal with this, a matter of ordinary care or from ordinary experience. If there, well that's true, with respect to, but there is a workman's compensation defense here, and Justice Gordon, you brought up the question of what's the duty imposed upon the architect, how can an architect imply with the logical extension of what they say is the duty here, which is basically to warn the school, to instruct the school about how to use the pit cover, I mean that's really what it boils down to, and are they going to be liable for any future injury if they didn't tell the school, you've got to either have the pit cover in place at all times, or you have to have rails or a guard. Last thing, the court's given us a great deal of time, it was said here to you this morning, and it is also said in plaintiff's brief, that the construction permit was issued with the pit cover in place, the building permit, that's not true, we document that at page 12 of our brief at the bottom, where we show the testimony that the building permit was issued without the pit cover. Before the supplemental? Exactly. Thank you. Thank you. Gentlemen, obviously there is no professional negligence in how you presented your case, and argued it was very well done. Thank you.